Louis H. LUNDGAARD, Appellant,

v.

Stephen C. BAXTER, Personal Representative of the Estate of Carl L. Baxter, Deceased; Stephen C. Baxter, individually; Clifford D. Knutson; and Bax, Inc., an Oklahoma corporation, Appellees.

No. 76543.

Court of Appeals of Oklahoma, Division No. 2.

July 21, 1992.

Rehearing Denied Oct. 26, 1992.

Certiorari Denied March 5, 1993.

F.L. Dunn III, Tulsa, for appellant.

Austin R. Deaton, Jr., Deaton & Davison, Inc., Ada, for appellees.

BRIGHTMIRE, Judge.

Did one mining partner obtain an assignment of the other partner's interest in an oil and gas lease joint venture by means of fraud and deceit, requiring the trial court to either rescind the assignment or award damages or both? The trial court held the evidence disclosed no malfeasance on the part of the assignee partner and denied relief to the complaining assignor.

The aggrieved partner appeals. We reverse.

### I

In order to deal fairly and understandably with the issues presented, it is necessary to make a somewhat extensive recitation of the relevant evidence adduced during the three-day bench trial.

The plaintiff, Louis H. Lundgaard, a former owner of a grocery store and feed mill, and the defendant, Carl L. Baxter, a former bank officer, had been business acquaintances since about 1958. In 1963 Lundgaard became involved in an oil and gas production venture with one of his feed mill customers, Lee Elliott, who owned and operated an oil and gas lease on property located near the South Canadian River in Pontotoc County, Oklahoma, commonly referred to as the "Norman Lease."[1] This mining partnership continued for several years until a personal tragedy forced Elliott to retire. He sold his interest to Baxter and several other investors. Eventually Baxter acquired other partnership interests, so that by the time relevant to his lawsuit, Lundgaard and Baxter each owned about one-half of the working interest in the Norman Lease.[2]

During the next several years the venture proved to be a profitable one. In 1982 Lundgaard and Baxter borrowed some money and drilled three directional wells to the Gilcrease formation. These wells substantially increased the venture's oil production. It was in connection with this drilling project that one Clifford Knutson entered the picture and provided the partners with valuable technical advice.[3] As compensation for his contribution to the success of the drilling program he was given a $1/32$ carried working interest.[4]

In October 1983 Baxter formed Bax, Inc., to which he assigned all of his interest in the Norman Lease. A few years later Baxter's son, Stephen, acquired a five percent working interest in the Norman Lease from Bax, Inc., and began to share in the lease's income and expenses.

Although Lundgaard and Baxter operated without a written partnership agreement, it is undisputed that they both managed and exercised control over the joint venture business. Records were kept early on in the name of "B & L Oil Lease" which later was incorporated as "B & L Oil Company, Inc." Generally speaking, Lundgaard and his bookkeeper took care of the partnership accounts and paid the expenses associated with the lease. Baxter, on the other hand, oversaw the field operations and verified the performance of claims for

---

1. The property subject to the leasehold in question is described as the SW/4 SW/4 and the N 13.7 acres of Sec. 26, T5N, R7E, Pontotoc County, Oklahoma.

2. The division order reflects that Baxter owned .40634747 and Lundgaard owned .40067363 of the total working interest of .80702110.

3. It is important to bear in mind that Knutson had been a drilling and production superintendent for Sun Oil Co. in the area for some twenty-eight years before retiring in 1984.

4. On March 18, 1982, Baxter and Lundgaard assigned to Knutson's daughter, Diana Gail Kelley, a .02521940 working interest in the Norman

services.[5]

Things went pretty well until May 29, 1987. On that date heavy rains caused the South Canadian River to leave its banks and completely inundate the Norman Lease. So severe was the flood that it caused the river to change its course in such a manner that several of the wells became located in the main channel of the river.[6] Alerted to the leasehold damage, Lundgaard met with Baxter, Stephen Baxter, Knutson, defendant Johnnie Wagner and another man on May 31, 1987, to survey the area.

The precise details of the parties' conversation that day were matter of some variance at trial. Lundgaard testified, on the one hand, that Baxter told him that the lease appeared to be a total loss; that it "looked like we were ruined"; and that it would take between $750,000 and one million dollars to recover the wells if, indeed, they could even be located. And faced with this gloomy outlook, Baxter proposed that he and Lundgaard each deposit $100,-000 in the bank to be used for immediate repairs.[7] Lundgaard informed Baxter he could not raise that much money. At that point, says Lundgaard, Baxter suggested they should try to find a buyer for the lease.[8]

Baxter, on the other hand, says the discussions on May 31 went this way: Baxter indicated he thought it would cost about $600,000 to redrill the four damaged producing wells, if necessary, and that they would need an additional $50,000 for rip rap to make roads to the well sites and to shore up the dikes around them. Baxter denied that he estimated the restoration costs at up to one million dollars. Baxter

did confirm, however, that Lundgaard told him he could not afford to participate in such a recovery effort and consequently an agreement was reached that each would seek a buyer for the lease. But, this agreement notwithstanding, Baxter said he told Lundgaard he intended to retain one-half of his interest in the lease.

According to Baxter, he contacted a business associate in Burkburnett, Texas, by the name of Cletus W. Howell. The latter expressed interest in purchasing the lease, said Baxter, and promptly visited it at which time he said he wanted a three-quarter working interest in the lease. Baxter said that at this point he reported to Lundgaard that he had "a possible buyer in Wichita Falls, Texas," but did not recall mentioning Howell, his visit, their conversation, or any other details.

Nor did Baxter disclose to Lundgaard that by June 2—just two days after the partners had met at the lease site—he, Baxter, had decided that the wells had not been destroyed and that their production could be restored for far less than he had originally said.[9] Instead, again without saying anything about it to Lundgaard, Baxter commenced recovery operations by hauling rock to the lease site on June 2 in order to build a road and erect dikes around each of the wells. By June 6 a road to at least two of the wells had been completed and these wells were apparently found to be restorable because Baxter promptly ordered replacement parts. There is no evidence Baxter informed his partner either about such activity or the favorable developments.

On June 7 Baxter called Lundgaard and represented that he was advised that the

---

Lease. She subsequently assigned this interest to Knutson on November 20, 1984.

**5.** Baxter owned two companies which had done work on the Norman Lease in the past—Ada Well Service Company and Superior Tank Company. The Ada Well Service Company's inventory, incidentally, included "workover rigs" which had serviced the Norman Lease in the past.

**6.** Pictures taken of the well area on May 31 depict a dismal and bleak raging flood over a

vast area reaching as far as the eye could see. Neither the wells nor the pumps were visible.

**7.** It does not appear that Stephen Baxter was asked to advance any restoration money.

**8.** At trial Baxter admitted he knew at this time that Lundgaard's financial condition was poor.

**9.** Baxter did not disclose to his partner the further significant fact that at the lease site he had conferred with Knutson who opined that the existing wells could be restored to production.

"people in Wichita Falls" thought that the value of the entire working interest was $200,000. If indeed Baxter had received such information from Wichita Falls, it would have meant, of course, that the proceeds of a sale of three-fourths of the working interest on that basis would be distributed as follows: $50,000 to Baxter for one-half of his interest and $100,000 to Lundgaard.[10] Baxter testified that Lundgaard then agreed to sell saying "if that is the best [deal] he could do, just go ahead and make the arrangements."

The next day Baxter went to his bank, the Oklahoma State Bank,[11] and withdrew $100,000 from his personal account. With it he purchased a cashier's check for that amount. He specifically instructed the bank teller to make the check payable to Lundgaard and to omit the name of the purchaser from the face of the check.

Baxter then took the cashier's check to his attorney—and son-in-law—defendant Greg Taylor, and instructed him to prepare an assignment of Lundgaard's working interest in the Norman Lease, but to leave the space for the name of the purchaser-assignee blank.[12]

Also on June 8, Baxter called Lundgaard and instructed him to meet attorney Taylor at the First National Bank later that day to close the deal. Lundgaard did so. When Lundgaard examined the assignment he noticed it did not contain the name of the assignee and asked Taylor who was getting the interest. Taylor said he did not know but would try to find out. The answer seemed to satisfy Lundgaard because he signed the assignment and took the check. Neither Baxter nor Taylor ever informed Lundgaard that Baxter had paid the pur-

chase money or that Bax, Inc., had become the assignee of his interest in the lease.

Two days later, on June 10, Baxter sold to his son, Stephen Baxter, and to Knutson each a twelve-and-one-half percent working interest in the lease. Baxter did not try to find a buyer for any of the remaining interest.

The undisputed evidence is that the recovery operations which had commenced on June 2 continued throughout the month of June. As soon as the dikes and roads were completed early in June, Baxter was able to assess the damage to the four wells located in the river channel. It was found that three pump jacks had been lost and that the pipe in one well had broken off below ground level and all the flow lines had been swept away. There were, however, no extensive downhole problems; none of the wellheads had completely broken off; and neither the rods nor tubes had dropped down the well shafts. Thus, in line with earlier predictions, production was restored to "the old well and two of the washed away wells" by the end of June. A month later Baxter was able to obtain a $450,000 line of credit with Citizens Bank and Trust Company to finance further development of the Norman Lease by merely pledging the lease as security. The same bank loaned the pumper, defendant Johnnie Wagner, funds with which to purchase a small working interest in subject lease.

Within a few months Lundgaard found out what had happened to him and on May 27, 1988, he filed this lawsuit in Pontotoc County asking the court to rescind his assignment and quiet title to his working interest in the Norman Lease on the ground the assignment was obtained by actual or constructive fraud on the part of

---

**10.** It is important to note at this point the following significant facts: The evidence later disclosed that the "people in Wichita Falls"—who Howell had supposedly said were making the offer and which Baxter had passed on to Lundgaard on June 7—turned out to be an individual who had died on an operating table the Sunday before the May 31 flood! The mystery is further deepened by the fact Howell is said to have been unaware the alleged buyer had been dead several days when his June 7 "offer" was passed on to Lundgaard!

**11.** Baxter was an officer and director of the Oklahoma State Bank.

**12.** The transfer of such interest occurred about a week or so before production from the first two wells was restored. The knowledge Knutson had of the condition of the Norman Lease wells prompted him to testify at trial he was prepared to risk his life savings and retirement funds to buy a share of Lundgaard's working interest.

the defendants. In the alternative he asked that he be awarded damages in the amount of at least $916,000 for loss of production revenue; $750,000 for loss of the value of the lease from June 8, 1987; $501,220 to extinguish encumbrances on the working interest; and punitive damages. He further alleged that the $100,000 he received for his interest in the Norman Lease was "grossly inadequate" and that the defendants induced his acceptance of it through "fraud, misrepresentation, concealment" and breach of a confidential relationship which existed between himself and Baxter at all times complained of.[13]

A bench trial commenced August 7, 1990. At the close of Lundgaard's evidence the court sustained demurrers interposed by defendants Doris Baxter, Johnnie Wagner, and Greg Taylor and dismissed the action as to them.[14] At the close of all the evidence the judge took the case under advisement and requested the parties to submit proposed findings of fact and conclusions of law. On October 2, 1990, the trial court pronounced judgment for the defendants. It was memorialized in a journal entry which contained some twelve findings of fact and six conclusions of law.

Lundgaard appeals advancing three propositions of error: The trial court erroneously concluded that (1) the defendants owed no fiduciary duties to him after the June 8, 1987, assignment; (2) the defendants owed no fiduciary duties to him either as directors and stockholders of a closely held corporation, or, in the case of Carl Baxter, while acting as his agent; and (3) the evidence did not establish that the assignment of his working interest was procured by fraud and deceit.

## II

To gain a proper orientational perspective concerning the issues presented, it is necessary to make a preliminary analysis of several of the trial court's findings of fact and conclusions of law which are crucial to a correct decision.

### A. THE FINDINGS OF FACT.

Finding No. 1 is:

"Defendants Carl Baxter, Stephen Baxter, and Clifford Knutson, neither individually nor as a group, formed the intent to defraud the plaintiff."

This finding is not only clearly contrary to the weight of the evidence but, even if it were true, it would not prevent the defendants, particularly Baxter, from being guilty of a deceitful and bad faith suppression of the relevant facts as well as their true opinions about the probable extent of the damage to subject wells. This conclusion is compelled for at least three reasons: (1) Having undertaken to disclose to Lundgaard what they represented to be their melancholy opinion of the dismal condition of the wells on May 31, they then embarked—without notifying Lundgaard—on a course of action inconsistent with such opinion which by June 8 enabled them to know as a fact that their initial opinion about all the wells being "ruined" had proved to be wrong; (2) the defendants had both a common-law and a statutory duty to make an honest, full and complete disclosure of all known relevant facts pertaining to the status of all of the wells on the Norman Lease and to keep Lundgaard apprised of their honest opinion and appraisal of the nature and extent of the damage to such wells; and (3) as we will later see, the critical question is not whether Baxter acted with an intent to defraud, but whether his deception induced Lundgaard to part with his lucrative leasehold interest.

Skipping over questionable Finding Nos. 2 and 3[15] we come to Finding No. 4:

"Between the time defendant Carl Baxter first expressed to the Plaintiff an opinion of the possible cost of restoration until the time Plaintiff assigned his inter-

---

13. It was about this time that Sun Oil Co. began holding one-half of the run payments in suspense.

14. Lundgaard does not challenge these dismissals in this appeal.

15. We pass over these two findings because they concern matters not germane to the issues involved in this review.

est in the lease, he did not learn anything which would have caused him to change that opinion."

This crucial finding is also clearly contrary to uncontroverted evidence of Baxter's actions.

We pass over Finding Nos. 5, 6, 7 and 8 [16] and next consider Finding No. 9:

"Under the circumstances then known to Plaintiff and Defendant Carl Baxter, the price for which Plaintiff agreed to sell his interest in the lease was not unreasonable."

Based on undisputed evidence we mentioned earlier this finding is clearly at war with the evidence. The undisputed evidence requires a finding that Baxter had good reason to believe at the time he purchased Lundgaard's interest that $100,000 was an unconscionably inadequate and unfair price.

In Finding No. 10 the court said:

"The decision of Defendant Carl Baxter to prepare an assignment with the name of the assignee omitted and draw a cashier's check with the name of the drawer omitted was made in good faith and without an intent to defraud."

This finding is another inference which is unwarranted when considered in light of Baxter's entire course of conduct from the initial examination of the lease on May 31 until the execution of the assignment on June 8. Requesting the blank assignment of Lundgaard's working interest and expressly directing the bank to conceal the fact that the interest was being paid for with Baxter's own money are in our opinion two strategic badges of fraud and deceit, particularly when considered in the context of Baxter's lease-related behavioral pattern beginning on May 31 and continuing throughout the post-flood period.

Next, Finding No. 11 is a particularly perplexing one. It reads:

"The price obtained when the interest of Plaintiff was reconveyed did not result in a profit to defendant Carl Baxter."

Assuming the interest referred to is that assigned on June 8 by Lundgaard to Baxter, such finding flies directly into a solid wall of undisputed evidence to the contrary—not the least of which is evidence of the lease's value which was established soon after the assignment when Baxter borrowed some $450,000 from the bank by pledging the lease as security. If, however, it refers to the minor interests later conveyed to Baxter's son and to Knutson, the finding is irrelevant in that his motive for making such transfers could not alter and certainly would not justify the tortious attainment of the June assignment.

Finally, the trial court made Finding No. 12:

"Only after Plaintiff conveyed his interest in the lease did Defendant Carl Baxter learn additional facts which would cause him to have a substantially different estimate of the costs of restoration of the lease."

This finding is also obviously contrary to uncontroverted evidence. As we previously mentioned Baxter knew and failed to disclose to Lundgaard at the time he took the assignment not only that one of the Norman Lease wells was still producing but that at least two of the flooded wells and probably all four could be saved at a cost far less than what he had previously told Lundgaard.

## B. THE CONCLUSIONS OF LAW.

The trial court's Conclusion No. 1 is immaterial except insofar as it implicitly recognizes the existence of a mining partnership between Lundgaard and both Baxter and Stephen Baxter when the flood occurred:

"A mining partnership is a creation of law, developed as a result of the desirability of a continuity of operation in the exploration of the mineral estate." [17]

Conclusion No. 2 is also immaterial. It reads:

---

**16.** These findings also deal with matters immaterial to our review.

**17.** The court's Conclusion No. 4, which reads: "The relationship between Plaintiff and defendant Carl Baxter was one of a mining partnership" is, of course, correct.

"The absence of *delectus personae* creates a relationship between mining partners which does not have all the same attributes as the relationship between general partners."

The more important legal conclusion applicable to mining partners is that the absence of the *delectus personae* attribute does not do away with or alter the fiduciary duties, involuntary or otherwise, imposed on all partners.

■ The court's Conclusion No. 3 is: "When one partner conveys his interest in the partnership the duty of good faith dealing and full disclosure ceases except as to those matters relating to the settlement of partnership accounts."

This legal conclusion, as we shall see later on, is erroneous as applied to the facts of this case. For where fraud, deceit, or breach of a fiduciary duty colors the acquisition of one mining partner's interest by another partner the latter is estopped to assert that his fiduciary duty ended with the ill-gotten conveyance or assignment.

Conclusion No. 5 reads:

"The failure of Defendant Carl Baxter to disclose to Plaintiff that he was advancing the purchaser from Texas was not a breach of a mining partner's duty of good faith dealing...."

The problem with this conclusion is that it is a mixture of both law and fact and both are incorrect. First of all the undisputed evidence discloses that Baxter could not have, and of course, did not advance money on behalf of any "purchasers from Texas" because, as we have seen, there was never even one such purchaser. The only evidence pertaining to a Texas purchaser in the record is that Howell said he was going to try to find one, but all he ever came up with was the revelation that the prospective buyer whom he said he had in mind had died on an operating table the Sunday before the flood damage occurred! And there is certainly no evidence Howell or anyone else ever asked Baxter to advance any money for the purchase of Lundgaard's interest. Under these uncontroverted circumstances the only reasonable inference to be drawn from the evidence is

that Baxter decided to buy Lundgaard's interest and consequently used his own $100,000 to do so—a critical secreted fact which Baxter was bound to disclose. Instead the undisputed evidence is he took two deliberate steps to conceal the identity of the purchaser when he directed the bank employee to omit his name from the cashier's check and instructed his lawyer to leave the name of the purchaser off of the assignment.

Finally the trial court's Conclusion No. 6 reads:

"The failure of Defendant Carl Baxter to disclose to Plaintiff the buyers from Texas had withdrawn did not constitute a breach of the duty of good faith dealing in the settlement of accounts when one mining partner conveys his interest in the partnership."

Like the fifth conclusion this one is a mixture of both law and fact. And again both are wrong. The "fact" found—withdrawal of "the buyers from Texas"—is erroneous because as we pointed out earlier there never was any buyer to withdraw—from Texas or anywhere else. The correct inference is that Baxter deceptively led Lundgaard to believe there were "buyers from Texas" as a ruse to camouflage his real objective—to acquire the interest himself. Certainly if there had been a Texas buyer Baxter had a legal duty to make a full and good faith disclosure of all such information. It was for Lundgaard to assess its significance—not Baxter.

### III

We turn now to Lundgaard's first assignment of error—that the trial court erred in concluding that the fiduciary duty owed by the defendant partners ended as soon as Lundgaard executed the assignment of his interest on June 8, 1987.

The argument is that as mining partners, Lundgaard and Baxter were fiduciaries and that they were therefore obliged by law to exercise the utmost good faith and openness in all their dealings with each other. Lundgaard further contends that this duty did not end with his execution of the assignment on June 8, but continued after

the dissolution through the wind-up period and until a final settlement of all partnership affairs was reached.[18] According to Lundgaard this was July 1, 1987, when he was removed as a director and he transferred his fifty percent of the stock in B & L Oil Company, Inc.—a corporation formed by the partners several months earlier to handle the lease operating expenses.[19] Thus, Lundgaard says, he and Baxter were bound by a fiduciary relationship as partners, fellow shareholders and directors of B & L Oil Company. And, adds Lundgaard, the high court has stated that a strict enforcement of this rule is especially required where, as here, it appears that one partner wants to get rid of the other. *See Waller v. Henderson*, 135 Okl. 231, 275 P. 323, (1929); and *Thomas v. Mathis*, 181 Okl. 1, 72 P.2d 484 (1937).[20]

Baxter, on the other hand, contends that the court correctly concluded that as a matter of law his fiduciary duty to Lundgaard ended as soon as Lundgaard executed the assignment on June 8, and beyond that date in this case where a jury is waived "the findings of the trial court are ... binding on appeal" since they are supported by "competent evidence."

In view of Baxter's argument, it is necessary to first determine what the nature of this action is and what standard of review is to be applied. In his petition Lundgaard sought two forms of relief with respect to what he denominated as three claims. Each "claim" arises out of the same transaction or set of facts and circumstances. The principal relief sought is to rectify the detriment resulting from what is alleged to be Baxter's deceitful concealment of material information concerning the probable status of the flooded wells as well as his own activities, knowledge, and intentions with regard to the status and restoration of the flooded wells—all in violation of his fiduciary duty to his partner Lundgaard—which induced Lundgaard to part with his interest in the Norman Lease. The first remedial relief Lundgaard asked for was rescission of the assignment of his interest in the lease and quieting his title. Alternatively, Lundgaard asked for money damages for the detriment he has suffered as a result of the deceit he alleged.[21]

■ The gravamen of this action is, therefore, the establishment of Lundgaard's right to rescind and cancel the June 8 assignment and to quiet his title to his interest in the Norman Lease. The prayer for damages is secondary and is therefore incidental to the principal relief requested. Under these circumstances the claim is one of equitable cognizance. *Liles v. Bigpond*, 190 Okl. 112, 121 P.2d 596 (1942); *Dancy v. Owens*, 126 Okl. 37, 258 P. 879 (1927). And the standard of review is whether the judgment of the court is clearly against the weight of the evidence.

■ As is evident from what we have said, our examination of the evidence convinces us that the challenged judgment is indeed clearly against the weight of the evidence. To begin with there is no question about the fact that Baxter and Lundgaard were partners and that they owed each other a fiduciary duty to use the highest good faith in their dealings with respect to matters affecting the Norman Lease. We agree with Lundgaard that such duty did not end the moment he signed the assignment on June 8, but continued until all

---

18. Title 54 O.S.1991 § 229, defines dissolution as follows:
   "The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business."
   And § 230 says:
   "On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed."

19. Lundgaard and Baxter each owned one-half of the 500 shares outstanding, and each, along with Stephen Baxter, were directors of the corporation until July 1, 1987.

20. In *Thomas* the supreme court reviewed an action for damages by a partner who was cheated out of his proper share of partnership property after he was induced to enter into a distribution agreement by reason of his partner's fraudulent concealment of material facts.

21. The record indicates that the runs from the lease have been held in suspense since the commencement of this action.

matters pertaining to the partnership were finally wound up which was no earlier than July 1, 1987.

Baxter says the cases cited by Lundgaard are not germane because in each, one partner was trying to get rid of another and in this case Baxter was not trying to get rid of Lundgaard. We disagree with this analysis for two reasons.

First, while the fact of getting rid of a partner was a significant factor in both *Waller* and *Thomas,* it was not an essential element of the primary legal principle upon which the decision ultimately rested. What the *Waller* court said—after alluding to the rule requiring the utmost of good faith between partners—was this: "The rule of good faith *is most especially required to be observed* where one partner is trying to get rid of another." [22] *Thomas* in turn quoted the *Waller* language. Indeed, *Thomas* went further and quoted the following significant refinement of the applicable precept promulgated by the high court in *Anderson v. Whitener,* 127 Okl. 284, 261 P. 156, 160 (1927): "In all proceedings connected with the formation, conduct, dissolution, and liquidation of a partnership, every partner is bound to act in the highest good faith towards his copartners. He may not obtain any advantage over them in the partnership affairs *by the slightest concealment, misrepresentation, threat, or adverse pressure of any kind.*" [23]

Secondly, the weight of the evidence clearly is that Baxter did, indeed, want to get rid of Lundgaard in the sense he wanted the latter's interest. And to this end Baxter concealed vital information on June 8 about the probable status of the flooded wells; about the commencement of his road building to the wells; and about his discovery that at least two of the flooded wells were restorable. That Baxter wanted Lundgaard's interest is further corroborated by the fact that Baxter did in fact turn out to be the buyer of Lundgaard's interest

on June 8, in that he withdrew $100,000 of his own money to "advance" on behalf of the phantom "buyers" who had never been identified or disclosed and who had never made an offer, and consummated by asking Lundgaard to sign an assignment in blank, giving him a cashier's check for $100,000 on which, it will be recalled, the name of the purchaser was omitted at the request of Baxter. [24]

The concealment of the true purchaser becomes even more significant when considered in light of Lundgaard's total reliance on Baxter as to what to do about his lease interest. The way Lundgaard expressed it, "if he sold, I would sell." In other words Lundgaard, who had handled the bookkeeping end of the venture, relied entirely on the judgment of Baxter for the field operation end of the business because it was Baxter who liked to handle, and did handle, the operation of the wells and frequently worked in the field doing various pumping chores and the like.

It is apparent from the undisputed facts that Baxter wanted to buy Lundgaard's interest on June 8 and in fact did so. And since it is obvious that he would not have wanted to buy it, and certainly would not have "advanced" the purchase price for it so casually, if he thought the four wells in the river had indeed been destroyed, it has to follow he had some favorable knowledge about the status of the wells which he should have shared with Lundgaard on June 8.

We find, then, that the trial court erred in concluding Baxter's fiduciary duty to Lundgaard ended with the latter's execution of the assignment.

**IV**

Lundgaard's last proposition is that the trial court erred in failing to find that the defendants were able to fraudulently obtain Lundgaard's interest in the Norman

---

**22.** *Waller,* 275 P. at 325–326 (emphasis added).

**23.** *Thomas,* 72 P.2d at 486 (emphasis added).

**24.** In the blank designated for the purchaser's name someone had typed in: "All interest, Norman Lease, Section 26, Township 5 North, Range 7 East, Pontotoc County."

Lease by deceitfully breaching the fiduciary duties each owed to him.

We agree. Since we have already reviewed the evidence in some depth, it is only necessary at this point to review the law of fraud and deceit.

The tort of deceit is defined by statute as:

> "A deceit, within the meaning of the last section, is either:
>
> 1. The suggestion, as a fact, of that which is not true by one who does not believe it to be true.
>
> 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true.
>
> 3. The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,
>
> 4. A promise, made without any intention of performing." (Footnote omitted.)[25]

And, the recovery of damages for such tort is authorized as follows:

> "One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."[26]

Actual fraud is statutorily defined this way:

> "Actual fraud, within the meaning of this chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, *or to induce him to enter into the contract:*
>
> 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true.
>
> 2. The positive assertion in a manner not warranted by the information of the person making it, of that which is not true, though he believe it to be true.
>
> 3. The suppression of that which is true, by one having knowledge or belief of the fact.
>
> 4. A promise made without any intention of performing it; or,
>
> 5. Any other act fitted to deceive." (Footnote omitted.) (Emphasis added.)[27]

and constructive fraud is defined by statute as follows:

> "1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,
>
> 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud."[28]

■ As we pointed out in *Doerr v. Henry*, 806 P.2d 669, 673 (Okl.App.1990), *cert. denied* (1991), "a party can be guilty of either actual or constructive fraud under the foregoing statutory law by [making] a misleading positive material statement not warranted by his information." And the same thing holds true in a situation such as here where one mining partner induces another to assign the latter's interest in an oil and gas lease by concealing material information in the face of a fiduciary duty to make a full and honest disclosure. Such conduct is by statutory definition actual fraud.[29]

■ Given these facts and circumstances along with the others mentioned earlier, this court is driven to the conclusion that Baxter knew Lundgaard was having some financial difficulties and handled the matter in the way he did solely for the purpose of acquiring Lundgaard's one-half interest in the lease at a cheap price. He succeeded and soon after Lundgaard executed the

25. Title 76 O.S.1991 § 3.

26. Title 76 O.S.1991 § 2.

27. Title 15 O.S.1991 § 58.

28. Title 15 O.S.1991 § 59.

29. *See also Faulkenberry v. Kansas City S. Ry.*, 602 P.2d 203 (Okl.1979), *cert. denied*, 464 U.S. 850, 104 S.Ct. 159, 78 L.Ed.2d 146 (1983); *Kelly v. Robertson*, 61 Okl. 85, 160 P. 46 (1916).

assignment in blank, Baxter inserted the name of Bax, Inc., as assignee—his wholly owned corporation. The betrayal was then complete.

We hold, therefore, that the willful and tortious fraud and deceit by Baxter induced Lundgaard to assign his interest in the Norman Lease to Baxter and Bax, Inc., and that he is entitled to the relief he seeks.

## V

The judgment appealed is reversed and the cause is remanded with directions to conduct a further hearing to determine what relief should be granted to the plaintiff. After hearing relevant evidence on the issues of rescission and damages, the court should advise the plaintiff of exactly what its judgment will be if the plaintiff elects rescission as his remedy and exactly what its judgment will be if the plaintiff opts for damages pursuant to its tort claim. Once the plaintiff makes such election the court shall enter judgment accordingly.

Reversed and remanded with directions.

RAPP, P.J., and BOUDREAU, J., concur.